**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| GREGORIO (MARCOS) MOLINA SANTANA, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RUSSELL HOTT, *in his official capacity as Field Office Director of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Washington Field Office*; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the U.S. Department of Homeland Security*; *and* MERRICK GARLAND, *in his official capacity as the Attorney General of the United States*, | ) ) ) ) ) ) ) ) ) ) ) | Case No. __:23-cv-<br>Judge _____ |
| | ) | |
| *Respondents*. | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS

Gregorio (Marcos) Molina Santana ("Mr. Molina"), by his attorneys, for his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, hereby alleges on the basis of his best personal knowledge, information and belief, as follows:

## INTRODUCTION

1. Mr. Molina, a native of El Salvador, has been forced by U.S. Immigration and Customs Enforcement (ICE) to wear a painful and intrusive ankle monitor for more than two-and-a-half years, including over four months since he was granted administratively final relief in his immigration case. Despite Mr. Molina's repeated requests to ICE for removal of the ankle monitor, ICE has taken no action to alleviate his suffering.

2.      Mr. Molina is 52 years old and suffers from a host of documented serious medical problems, including hypothyroidism, epilepsy, heart disease, a history of repeated traumatic brain injuries, and diagnosed mental health concerns including schizophrenia and major depressive disorder.

3.      In April 2019, ICE took Mr. Molina into custody and detained him at the Farmville Detention Center in Virginia. On October 23, 2020, an Immigration Judge (IJ) granted Mr. Molina protection from removal to El Salvador under the provisions of the United Nations Convention Against Torture (CAT). The Department of Homeland Security (DHS) appealed the Immigration Court's decision to the Board of Immigration Appeals (BIA).

4.      During the pendency of the appeal, ICE released Mr. Molina from detention pursuant to an ICE Order of Supervision issued on March 12, 2021, under ICE's Intensive Supervision Appearance Program (ISAP).  The Order of Supervision provided that Mr. Molina wear an ankle monitor for purposes of electronic surveillance and comply with other specified conditions.

5.      The BIA reversed the IJ's ruling and "remand[ed] the record for the Immigration Judge to adjudicate the applicant's application for withholding of removal in the first instance," by decision dated February 10, 2022. Following further proceedings on remand, the IJ issued a new decision in Mr. Molina's favor on June 12, 2023, granting him protection from deportation to El Salvador on the grounds that Mr. Molina was entitled to withholding of removal. DHS did not appeal the IJ's decision and his grant of protection is thus administratively final.

6.      Although the IJ granted Mr. Molina withholding of removal nearly five months ago, Mr. Molina remains subject to the constraints of ankle monitoring imposed by ICE in March 2021—more than two-and-a-half years ago.

7.      The ankle monitor has caused and continues to cause Mr. Molina severe discomfort and pain, and it hampers his ability to conduct activities that are essential to his overall health and well-being, such as exercise and proper sleep.  When Mr. Molina moves his body in any way that causes the ankle monitor to shift position, the impact causes bruising and pain in his entire lower leg.  He has not been able to experience a full night of uninterrupted sleep for years because of the ankle monitor, and general fatigue due to this sleep deprivation aggravates his serious mental health problems.

8.      The continued ankle monitoring has also negatively affected Mr. Molina's livelihood. He has lost several jobs because of his employers' negative reactions to the ankle monitor. He has been told that he must not be "legal" and that he should "fix his problems with immigration" before returning to work, despite having a valid employment authorization document and Social Security number. This lack of steady income has in turn made it difficult for Mr. Molina to maintain stable housing, afford reliable transportation, and access his medications and other important healthcare services.

9.      Mr. Molina, through counsel, has repeatedly requested that ICE remove the ankle monitor because of the enormous negative impact the monitor has had on his quality of life and mental and physical well-being.  ICE has either wholly disregarded these requests or provided perfunctory acknowledgements of receipt but has thus far declined to provide a meaningful response to Mr. Molina's entreaties.

10.     ICE's continued subjugation of Mr. Molina to this form of electronic surveillance is wholly unwarranted and constitutes an infringement of his liberty interests of indefinite duration in violation of his fundamental rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.   Moreover, ICE's refusal to free Mr. Molina from ongoing electronic

surveillance *via* the medium of an ankle monitor flatly contravenes its own established written policies and constitutes agency action that is arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act (APA).

11.    For these reasons, as elaborated more fully below, this Petition for a Writ of Habeas Corpus should be granted.

<u>JURISDICTION AND VENUE</u>

12.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 2241 (the general grant of habeas authority to the federal district courts); Art. I, § 9, cl. 2 of the U.S. Constitution ("Suspension Clause"); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act).

13.    Federal district courts are vested with jurisdiction to address habeas claims of noncitizens challenging the lawfulness and/or conditions of their custody following the entry of a removal order against them. *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001). Federal courts also have jurisdiction to address habeas claims of non-detained noncitizens who are subject to a final order of removal. *See, e.g.*, *Rosales v. Bureau of Immigration & Customs Enforcement*, 426 F.3d 733, 734 (5th Cir. 2005) (holding that a noncitizen "who is subject to a final order of deportation . . . is 'in custody'" for habeas purposes); *Simmonds v. INS*, 326 F.3d 351, 354 (2d Cir. 2003) (same); *Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1291 (10th Cir. 2001) (same); *Mustata v. U.S. Dep't of Justice*, 179 F.3d 1017, 1021 n. 4 (6th Cir. 1999) (same); *Nakaranurack v. United States*, 68 F.3d 290, 293 (9th Cir. 1995) (same).

14.    Federal courts also have federal question jurisdiction, through the APA, to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). APA claims are cognizable on

habeas. 5 U.S.C. § 703 (providing that judicial review of agency action under the APA may proceed by "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus"). The APA affords a right of review to a person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Respondents' continued, unjustified ankle monitoring of Mr. Molina has adversely and severely affected his liberty and freedom.

15.     Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1), because Mr. Molina resides and is experiencing the unlawful condition upon his release from which relief is sought in this district, and because all or a substantial part of the events and/or omissions giving rise to this action occurred and continue to occur within this district.

PARTIES

16.     Mr. Molina, a native and citizen of El Salvador, was granted protection from removal by a now-final decision of the Immigration Court in June 2023.  He currently resides, subject to the continuing obligation to wear an ankle monitor, in Alexandria, VA.

17.     Russell Hott is the Field Office Director of the U.S. Immigration and Customs Enforcement and Removal Operations Washington Field Office.  Mr. Hott is and/or was at all relevant times a legal custodian of Petitioner.  He is sued in his official capacity.

18.     Alejandro Mayorkas is the Secretary of the U.S. Department of Homeland Security (DHS).  DHS oversees ICE, which is responsible for administering and enforcing immigration laws.  Secretary Mayorkas is and/or was at all relevant times the ultimate legal custodian of Petitioner.  He is sued in his official capacity.

19.     Merrick Garland is the Attorney General of the United States.  He oversees the entire immigration court system, housed within the U.S. Department of Justice Executive Office

for Immigration Review (EOIR), including all Immigration Court Judges and the Board of Immigration Appeals. He is sued in his official capacity.

LEGAL FRAMEWORK

20.    Pursuant to authorization delegated by the Attorney General under 8 U.S.C. § 1226(a), at any point during the pendency of a removal proceeding, ICE—upon its officers' review and evaluation of an applicant's criminal, immigration and supervision history, family and/or community ties, status as a provider or caregiver, and humanitarian or medical considerations, or other relevant factors—may determine that the applicant should be released from detention subject to alternative conditions of non-custodial supervision under the Intensive Supervision Appearance Program. *See* U.S. Immigration and Customs Enforcement, *Alternatives to Detention* at 1 (updated July 6, 2023), *available at* https://www.ice.gov/features/atd. "Each noncitizen enrolled in ISAP receives an individualized determination as to their level of supervision." *Id*. ISAP "relies on the use of electronic ankle monitors, biometric voice recognition and image recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants." *Mathon v. Searls*, 623 F. Supp. 3d 203, 217 (W.D.N.Y. 2022). ISAP can be understood as "a form of supervised parole." *Nken v. Napolitano*, 607 F. Supp. 2d 149, 151 (D.D.C. 2009).

21.    ICE's Alternatives to Detention (ATD) programs, including the ISAP pursuant to which Mr. Molina was released from detention subject to conditions, "exist to ensure compliance with release conditions and provide important case management services for non-detained noncitizens." *See* U.S. Immigration and Customs Enforcement, *supra* at 1. "ATD enables noncitizens to remain in their communities—contributing to their families and community

6

organizations and, as appropriate, concluding their affairs in the U.S.—*as they move through immigration proceedings or prepare for departure.*" *Id.* at 2 (emphasis added).

22.    ICE generally enrolls three categories of noncitizens in ISAP: "(1) [noncitizens] who are in removal proceedings but have not yet been issued final orders of removal and may be at risk to flee; (2) [noncitizens] who have been issued final orders of removal and are considered dangerous, but who cannot legally be held in custody any longer; and (3) [noncitizens] with final orders of removal who have been released from custody on general orders of supervision, but who have violated their orders by committing crimes or otherwise failing to comply with release conditions." *Nguyen v. B.I. Inc.*, 435 F. Supp. 2d 1109, 1112 (D. Or. 2006).

23.    "There is no contractual minimum or maximum amount of time that [a noncitizen] must spend in ISAP, but ICE will generally terminate [a noncitizen's] participation in the program within one year if there have been no serious violations of program requirements." *Id*. at 1113.

24.    A noncitizen enrolled in ISAP or other ATD program can request review of the conditions of their supervision before a final order of removal under INA § 240 (8 U.S.C. § 1229(a)) is entered. Within seven days of being "released from custody," a noncitizen may request review of their ATD conditions before an Immigration Judge. 8 C.F.R. § 1236.1(d)(1).[1] Following the first week of being released from detention, a noncitizen "may request review by [ICE] of the conditions of his or her release." 8 C.F.R. § 1236.1(d)(2). If the noncitizen is not satisfied by ICE's decision on his or her request for review, he or she "may appeal [to the BIA]

---

[1] The Board of Immigration Appeals has interpreted "released from custody" as equivalent to "released from detention." *Matter of Aguilar-Aquino*, 24 I&N Dec. 747, 752 (BIA 2009).

from [ICE's] decision under paragraph (d)(2)(i) [*sic*] of this section" within 10 days of that decision. 8 C.F.R. § 1236.1(d)(3)(ii).[2]

25.    No such provisions for review of ATD conditions exist for noncitizens who have received a final order of removal or who are subject to reinstatement of a prior removal order like Mr. Molina.

26.    In response to a noncitizen's request, or on its own initiative, ICE "*may* escalate or de-escalate a noncitizen's supervision level by considering certain factors. Factors considered in both initial placement and changes to supervision level, as relevant, include criminal history, compliance history, community or family ties, caregiver concerns, and other humanitarian or medical concerns." *See* U.S. Immigration and Customs Enforcement, *supra* at 3 (emphasis added).

27.    ICE has issued various directives and memoranda articulating its policy on ATD conditions, including ankle monitoring.  Three of these policy documents are relevant here: (i) an ICE Memorandum on the "Use of GPS Monitoring Devices on Persons who are Pregnant or Diagnosed with a Severe Medical Condition," issued on September 14, 2009 ("2009 Venturella Memo"); (ii) an ICE Memorandum on "Alternatives to Detention Program Participant Enrollment Guidance," issued on February 28, 2011 ("2011 Mead Memo"); and (iii) ICE Directive 11063.2, issued on April 5, 2022 ("2022 Directive"). To Petitioner's knowledge, they have not been rescinded or superseded.

28.    The 2009 Venturella Memo provides guidance to ICE Field Office Directors (FODs) and Deputy FODs on the use of GPS monitoring devices (including ankle monitors) on

---

[2] The referenced paragraph—8 C.F.R. § 1236.1(d)(2)(i)—does not exist, thus calling into question the actual availability of appeal and whether there exist sufficient procedural safeguards in the adjudication of amelioration requests. Nevertheless, the regulation clearly contemplates a decision from ICE on the request for review.

noncitizens with severe medical conditions. *See* Ex. 1. 2009 Venturella Memo. The memorandum states that "effective immediately," ICE was discontinuing the use of "ankle [monitors] on persons whose medical conditions render the use of these devices inappropriate." *Id*. at 1. The memorandum instructs "ATD personnel" to "transfer anyone currently wearing ankle [monitors] and who fall into this category to another form of monitoring." *Id*. The memorandum also states that "[t]his change in practice does not prevent affected persons from remaining in the ATD program, provided they accept the changed terms of participation," *i.e.,* the other form(s) of monitoring that ICE proposes. *Id*.

29.      The 2011 Mead Memo provides guidance to all ICE FODs on enrollment (and dis-enrollment) of certain noncitizens in ATD programs. *See* Ex. 2, 2011 Mead Memo. In relevant part, the memorandum states that noncitizens "who are not likely to be removed in the reasonably foreseeable future should not be enrolled (*or continued*) in the ATD program." *Id*. at 1 (emphasis added).

30.      The 2022 Directive governs the identification, communication, recordkeeping, and safe release planning for detained individuals with serious mental disorders or conditions and/or who are determined to be incompetent by an immigration judge. *See* Ex. 3, 2022 Directive. The 2022 Directive defines a "serious mental disorder or condition" as "a mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning . . . or a severe medical condition(s) (e.g., traumatic brain injury or dementia) that is significantly impairing mental function[.]" *Id*. at 4. This definition also covers individuals who are "demonstrating significant symptoms of . . . Schizophrenia or Schizoaffective Disorder." *Id*. The 2022 Directive governs ICE's current imposition of release conditions. The 2022 Directive states that ICE "FODs will … [w]ork collaboratively with attorneys of record . . . after the release of

individuals with serious mental disorders or conditions and/or who are determined to be incompetent by an IJ on ongoing reporting conditions or obligations to ensure they are appropriate and any participation in an ICE Alternatives to [Detention] program is tailored to the individual's special needs." *Id*. at 8-10.

<u>STATEMENT OF FACTS</u>

31.     Mr. Molina was born in El Salvador in 1971, and has never been a citizen of any other country. *See* Ex. 4, Declaration of Mr. Molina, at 1.

32.     He first entered the United States in 2002 and lived in the U.S. until he was detained in 2010.  He was deported in early 2012 and returned briefly to El Salvador before moving to Mexico, where he resided until 2017, when he returned to the U.S.  He was again detained in 2019, and was being held in ICE custody at the Farmville Detention Center in Virginia when he applied for withholding of removal and/or protection from removal under the CAT in June 2020, following an IJ determination that Mr. Molina had established a reasonable possibility that he would be persecuted or tortured if he was returned to El Salvador. *See id*. at 1-2.

33.     On July 13, 2020, Mr. Molina, assisted by counsel, filed a motion seeking a determination of incompetency and requesting the implementation of procedural safeguards based on his mental health problems and other medical issues.  At the ensuing competency hearing, Mr. Molina's counsel presented evidence concerning his documented hallucinations, memory and communication issues, and his difficulties distinguishing between fiction and reality, as well as his epilepsy.  The IJ determined that Mr. Molina had limited ability to tell his own history, consistent with the symptoms presented and described in his medical records.  The IJ found that Mr. Molina was not competent to proceed without procedural safeguards. *See* Ex. 5, IJ Decision dated October 23, 2020, at 3-4.

34.     At an evidentiary hearing on September 10, 2020, Mr. Molina and a supporting witness testified and provided additional written evidence in support of his application for withholding of removal and CAT protection. Following that hearing, the IJ granted his request for protection from removal to El Salvador under the CAT, holding that Mr. Molina "faces threats of torture or death from official state actors such as the police and de facto state actors such as MS-13 and other gangs—who control a wide swath of [El Salvador]." *See id*. at 16.  As the Immigration Court granted Mr. Molina protection from removal under the CAT, it did not reach or rule upon his alternative claim for withholding of removal under 8 U.S.C. § 1231(b)(3).  *Id*. Mr. Molina remained detained while DHS appealed the IJ's decision.

35.     Thereafter, in March 2021, ICE released Mr. Molina from detention at Farmville, imposing as a condition of his release continuing supervision via an ankle monitor and reporting to an ISAP officer for periodic appointments on an in-person basis. *See* Ex. 4, Mr. Molina's Declaration, at 1; *see also* Ex. 6, ISAP Order of Supervision.

36.     Following full briefing of DHS's appeal of the IJ's decision granting Mr. Molina protection under the CAT, a panel of the BIA reversed the IJ's ruling and "remand[ed] the record for the Immigration Judge to adjudicate the applicant's application for withholding of removal in the first instance," by decision dated February 10, 2022.

37.     By letter submitted to the Office Director of ICE's Washington Field Office on August 4, 2022, Mr. Molina's counsel requested that his ankle monitor be removed at his then-upcoming ISAP office appointment on August 11, 2022.  *See* Ex. 7, Letter to ICE dated August 4, 2022. ICE did not respond to this letter and the ankle monitor was not removed.

38.     Six months later, Mr. Molina's counsel made another written request to ICE for the removal of the ankle monitor by electronic mail in February 2023. Again, the request was ignored;

no response was provided. During this same period and continuing to the present day, Mr. Molina repeatedly requested at his check-in appointments with the ISAP office that the ankle monitor be removed but was refused. *See* Ex. 4, Mr. Molina's Declaration, at 5.

39.     Following further proceedings on remand, the IJ issued a new decision in Mr. Molina's favor on June 12, 2023, again granting him protection from removal to El Salvador, this time on the grounds that he was entitled to withholding of removal under 8 U.S.C. § 1231(b)(3)(A) because it was more likely than not that he would be subject to persecution by the government or others if returned to El Salvador. *See* Ex. 8, IJ Decision dated June 12, 2023.

40.     In its decision, the IJ concluded:

> that [Mr. Molina] has met his burden to demonstrate that the government of El Salvador will be unable or unwilling to protect him from persecution by police and state healthcare officials on account of his membership in [the particular social group of] "Salvadoran males with schizoaffective disorder, [traumatic brain injury] and [post-traumatic stress disorder] who exhibit outwardly erratic behavior," as the government is one of the [actors] who would target and harm him.  The Court further finds that [Mr. Molina] has also met his burden with respect to the government being unable or unwilling to protect him from . . . gangs and community members.

*Id*. at 13.

41.     DHS did not appeal the IJ's June 12, 2023 decision to the BIA within 30 days thereafter, and the decision is administratively final.  *See* 8 C.F.R. § 1241.31.

42.     Subsequently, by electronic mail transmitted on June 28, 2023, Mr. Molina's counsel advised his ICE Monitoring Officer of the IJ's recently issued decision granting Mr. Molina protection from removal for a second time and requested that his ankle monitor be removed as soon as possible, noting that "[t]he ankle monitor has been a serious source of anxiety, stress, and physical discomfort for Mr. Molina for over two years."  In this instance, counsel received a

pro forma email response stating only that "[y]our request will be reviewed in the order that it has been received." *See* Ex. 9, Email to ICE dated June 28, 2023. No further communication from ICE has been received.

43.    Most recently, when Mr. Molina met with his ISAP officer on September 8, 2023, the officer refused to take any action with respect to removal of the ankle monitor, stating that he had no information about when the monitor might be removed and advising Mr. Molina to "follow-up with his lawyer about that." *See* Ex. 4, Mr. Molina's Declaration, at 4.

## REASONS FOR GRANTING THE WRIT

**A.    MR. MOLINA'S CONTINUED SUBJUGATION TO ELECTRONIC MONITORING VIA AN ANKLE MONITOR IMPERMISSIBLY INFRINGES ON HIS LIBERTY INTEREST PROTECTED BY THE DUE PROCESS CLAUSE.**

44.    "The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person…of…liberty…without due process of law.' Freedom from imprisonment —from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (citation omitted). This protection extends to all "persons," including noncitizens. "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693 (citations omitted).

45.    As the recipient of a final order of removal and the subject of ongoing governmental supervision in the ISAP, Mr. Molina remains in "government custody… or other forms of physical restraint" infringing upon his liberty interest fundamentally protected by the Due Process Clause. *See Jones v. Cunningham*, 371 U.S. 236, 242-43 (1963); *Romero v. Sec'y, U.S. Department of Homeland Security*, 20 F.4th 1374, 1379 (11th Cir. 2021) (the "in custody" requirement of 28 U.S.C. § 2241 "should be construed 'very liberally'" and habeas petitioners "need only show that

they are subject to a significant restraint on their liberty that is not shared by the general public." (quoting *Howard v. Warden*, 776 F. 3d 772, 775 (11th Cir. 2015))).

46.     Mr. Molina's ankle monitor constitutes just such a "significant restraint on [his] liberty," *id.*, with respect to which he has no recourse. Currently, there are no publicly-disclosed rules, regulations, procedures or guidelines pursuant to which individuals like Mr. Molina can challenge or appeal the imposition of conditions upon release from detention under the ISAP. ICE may respond to a noncitizen's request for amelioration of conditions, such as Mr. Molina has made, however it chooses, including by choosing to provide no meaningful response at all, the option it has selected here.

47.     "The fundamental requirement of due process is . . . to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). Here, although Mr. Molina has an administratively final Immigration Court decision granting him withholding of removal, such that he is no longer *either* "mov[ing] through immigration proceedings" *or* "prepar[ing] for departure" from the United States—the two circumstances upon which the imposition of conditions upon noncitizens under the ISAP is expressly premised (*see* ¶ 21, *supra*)—he has no opportunity to be heard by ICE at a meaningful time or in a meaningful manner concerning the removal of his ankle monitor.

48.     In determining whether the infringement of Mr. Molina's liberty interest resulting from his indefinite subjugation to continued ankle-monitoring by ICE violates due process, *Mathews* prescribes analysis addressing three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

14

> administrative burdens that additional or substitute procedural requirement would entail.

424 U.S. at 335 (citation omitted). Applying the *Mathews* test to the circumstances of this case, the violation of Mr. Molina's due process rights is clear.

49.     *First*, the private interest involved here, as addressed above, is Mr. Molina's desire and need for freedom from the government's ongoing electronic surveillance through the medium of ankle monitoring—a medium that has significantly, severely interfered with Mr. Molina's quality of life by inflicting constant discomfort and pain, causing sleeplessness and aggravation of his documented mental illness, and depriving him of gainful employment opportunities. Because of the absence of any cognizable process and ICE's apparent reluctance and/or refusal to even respond to Mr. Molina's requests for amelioration, he faces the prospect of having this infringement of his liberty interest continue indefinitely.

50.     While the imposition of conditions upon Mr. Molina's release from detention under the ISAP may have been warranted under, or even supported by, legal justification in March 2021 at which time DHS' appeal from the first Immigration Court decision in Mr. Molina's favor was pending (although Mr. Molina does not concede this point), no such continuing rationale exists in the aftermath of the Immigration Court's second ruling granting withholding of removal, which is now administratively final.

51.     Although the Court, in the different circumstances presented in *Mathews*, observed that "something less than an evidentiary hearing is sufficient prior to adverse administrative action" (*see* 424 U.S. at 343), here Mr. Molina has not been provided—and has been given no reason to believe he will be provided—*any* process, much less any process that would conform to established procedural due process norms, even though he no longer confronts the prospect of "adverse administrative action."

52.     *Second*, under the *Mathews* analysis, it must be acknowledged that consideration of "the risk of an erroneous deprivation" of Mr. Molina's liberty interest through such procedures as ICE utilized in subjecting him to the ISAP program, and "the probable value, if any, of additional . . . procedural safeguards,"—424 U.S. at 335—weigh overwhelmingly in his favor.

53.     Here, an "erroneous deprivation" of Mr. Molina's liberty interest is not merely at risk, but has already been realized and may continue indefinitely, precisely because there is *no* process currently available to him through which he can effectively seek to alter the status quo.

54.     Whatever considerations informed ICE's determination nearly three years ago to subject Mr. Molina to electronic surveillance *via* ankle-monitoring when he was released from custodial detention, there is no medium available to him by which to challenge the continuing validity of those considerations – or any others that ICE might invoke as an ongoing justification for maintaining his surveillance at present.  *See generally*, *Velasco Lopez v. Decker*, 978 F.3d 842, 853 (2d Cir. 2020) ("'[A]s the period of . . . confinement grows,' so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention.")(*citing Zadvydas*, 533 U.S. at 701).

55.     Accordingly, it is readily apparent that the "probable value" of virtually any process ICE might offer as a means by which Mr. Molina can make his case for liberation from continuing monitoring is enormous, while ICE's rationale for declining to provide such process appears to be non-existent.   A reasoned decision on the part of ICE, subject to appropriate review by an Immigration Judge; a hearing before an IJ in the first instance; or a hearing before this Court in which ICE would bear the burden of justifying its continued ankle-monitoring surveillance of Mr. Molina given the favorable disposition of his immigration case, are all options that might meet his procedural due process needs under the circumstances of this case.  Moreover, the provision of

such a review or hearing would be nothing out of the ordinary for the Immigration Court, which regularly conducts bond hearings for detained noncitizens involving the analysis of public safety and flight risk concerns and is already authorized to undertake review of ATD conditions within a narrow timeframe under 8 C.F.R. § 1236.1(d). *See supra* ¶ 24.

56.    "In striking the appropriate due process balance the final factor to be assessed is the public interest.  This includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to [the continuation of electronic surveillance under Mr. Molina's circumstances]." *Mathews*, 424 U.S. at 347; *Velasco Lopez*, 978 F.23d at 854 ("We now turn to the third factor in the *Mathews* analysis: 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" (citation omitted)).

57.    Here, insofar as the limited record in this case and the exhaustive research conducted by Petitioner's counsel reveal, there is *no* process pursuant to which an individual in Mr. Molina's position—having received a final order of removal, accompanied and offset by an administratively final determination regarding his entitlement to withholding from removal, but nevertheless remaining subject to a condition of electronic surveillance by ICE—can challenge the continuation of that condition.  Unless there are other noncitizens dispersed around the country whom ICE has subjected to a similar conundrum, it seems fair and reasonable to assume that imposing upon the government the obligation to provide some medium through which Mr. Molina's situation can be challenged would involve the imposition of only a modest expense to and a minimal burden upon the government in the form of some sort of hearing.

58.     Moreover, there should be only extremely limited, if any, public interest in the denial of such process, absent any genuine, credible indication that Mr. Molina poses a public safety risk, and he clearly has no interest in or reason to "flee" given the successful outcome reached in his immigration case.  Mr. Molina's modest pre-detention criminal activity involved non-violent crimes most likely attributable to his mental illness, and from his time commencing in governmental detention in April 2019 through the present, he has not had any encounters with law enforcement suggesting that he poses any risk or threat to public safety whatsoever.  Thus, the distressing ankle-monitoring to which Mr. Molina remains subject has no rational relationship to any legitimate governmental interest.  This infringement upon Mr. Molina's liberty interest must cease.  *Velasco Lopez*, 978 F.3d at 854 ("The Government has not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor at risk of flight.").

59.     Therefore, fairly considered under the *Mathews* three-part analysis, Mr. Molina's entitlement to relief from the government's continued electronic surveillance in violation of his fundamental rights and interests under the Fifth Amendment's Due Process Clause is established and relief from this Court is due and owing.

**B.      ICE'S CONTINUED SUBJUGATION OF MR. MOLINA TO RESTRICTIVE ATD CONDITIONS, WITHOUT CONSIDERING DISENROLLMENT OR LESS RESTRICTIVE ALTERNATIVES UNDER RELEVANT ICE POLICIES, VIOLATES THE APA PURSUANT TO THE *ACCARDI* DOCTRINE.**

60.     Under the *Accardi* doctrine, which originated in the context of an immigration case and has been developed through subsequent immigration caselaw, agencies are bound to follow their own rules that affect the fundamental rights of individuals, even self-imposed policies and processes that limit otherwise discretionary decisions. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 226 (1954) (holding that BIA must follow its own regulations in its exercise of discretion); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals

are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required.").

61.    The requirement that an agency follow its own policies is not "limited to rules attaining the status of formal regulations." *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991). Even an unpublished manual or policy binds the agency if "an examination of the provision's language, its context, and any available extrinsic evidence" supports the conclusion that it is "mandatory rather than merely precatory." *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977); *see also Morton*, 415 U.S. at 235–36 (applying *Accardi* to violation of internal agency manual); *U.S. v. Heffner*, 420 F.2d 809, 812 (4th Cir. 1969) ("Nor does it matter that these IRS instructions to Special Agents were not promulgated in something formally labeled a 'Regulation'. . . .").

62.    When agencies fail to adhere to their own policies as required by *Accardi*, courts typically frame the violation as arbitrary, capricious, and contrary to law under the Administrative Procedure Act (APA), *see Damus v. Nielson*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018) ("It is clear, moreover, that [*Accardi*] claims may arise under the APA"), or as a due process violation, *see Sameena, Inc. v. United States Air Force,* 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." (internal quotations omitted)).

63.    Moreover, prejudice is generally presumed when an agency violates its own policy. *See Montilla,* 926 F.2d at 169 ("[W]e hold that an alien claiming the INS has failed to adhere to its own regulations . . . is not required to make a showing of prejudice before he is entitled to relief. All that need be shown is that the subject regulations were for the alien's benefit and that the INS

failed to adhere to them."); *Heffner*, 420 F.2d at 813 ("The *Accardi* doctrine furthermore requires reversal irrespective of whether a new trial will produce the same verdict.").

64.    To remedy an *Accardi* violation, a court may direct the agency to properly apply its policy, *see Damus*, 313 F. Supp. 3d at 343 ("[T]his Court is simply ordering that Defendants do what they already admit is required."), or a court may apply the policy itself and order relief consistent with the policy. *See Jimenez v. Cronen*, 317 F. Supp. 3d 626, 657 (D. Mass. 2018) (scheduling bail hearing to review petitioners' custody under ICE's standards because "it would be particularly unfair to require that petitioners remain detained . . . while ICE attempts to remedy its failure").

      **1.    ICE's Continued Ankle Monitoring Violates the 2009 Venturella Memo.**

65.    Mr. Molina's serious physical and mental health conditions would clearly fall under any reasonable definition of the term "severe medical condition" as referenced in the 2009 Venturella Memo. *See* Ex. 1, 2009 Venturella Memo. Given Mr. Molina's adverse health problems, ICE has violated the 2009 Venturella Memo by refusing to remove the ankle monitor and employ a less harmful, less burdensome means of monitoring (even assuming that any type of continued monitoring is even authorized and appropriate at this point).

      **2.    ICE's Continued Ankle Monitoring of Mr. Molina Violates the 2011 Mead Memo.**

66.    Given his final grant of withholding of removal in June 2023, Mr. Molina is "not likely to be removed in the reasonably foreseeable future" and should "not be … continued … in the ATD program" for that reason. *See* Ex. 2, 2011 Mead Memo. ICE has violated the 2011 Mead Memo by continuing to impose harmful ATD supervision on the Mr. Molina despite his final grant of relief from removal and the unlikelihood of his future removal.

### 3.   ICE'S Continued Ankle Monitoring Violates the 2022 Directive.

67.   As mentioned above, Mr. Molina has several serious conditions that affect his memory and general mental/intellectual function, including a history of traumatic brain injuries and a diagnosis of Schizoaffective Disorder. *See* Ex. 5, IJ Decision dated October 23, 2020, at 2-3, 8. An Immigration Judge declared Mr. Molina incompetent in July 2020 as part of his removal proceedings. *Id*. ICE was aware of Mr. Molina's physical and mental health conditions while he was detained in Farmville, Virginia, and was aware of the IJ's incompetency ruling before it released Mr. Molina from detention and placed an ankle monitor on him in March 2021. ICE has violated this Directive repeatedly by disregarding its obligation to "work collaboratively" with Mr. Molina's attorneys of record to ensure that his release conditions—including ankle monitoring— are "appropriate" and "tailored to [his] special needs." Mr. Molina, personally and through counsel, has repeatedly requested that ICE remove the ankle monitor and impose less restrictive conditions of supervision. To date, ICE has ignored and/or provided no substantive response to these entreaties.

68.   These three policies are precisely the type of rules that ICE is obligated to follow under *Accardi*. In *Damus*, the U.S. District Court for the District of Columbia found that a similarly styled ICE directive from 2009 laying out "procedures ICE must undertake to determine whether a given asylum-seeker should be granted parole" fell "squarely within the ambit of those agency actions to which the [*Accardi*] doctrine may attach," in part because it "establish[ed] a set of minimum protections for those seeking asylum" and "was intended—at least in part—to benefit asylum-seekers navigating the parole process." 313 F. Supp. 3d at 324, 337-38; *see also Pasquini v. Morris*, 700 F.2d 658, 663 n.1 (11th Cir. 1983) ("Although the [INS] internal operating instruction confers no substantive rights on the [noncitizen]-applicant, it does confer the procedural right to be considered for such status upon application."). Similarly, the policies here establish

procedures for reviewing the use of ankle monitors on particularly vulnerable noncitizens and those who are not likely be removed in the foreseeable future and are clearly intended, at least in part, to benefit those noncitizens.

69.     Moreover, ICE's failure to follow these policies is prejudicial to Mr. Molina. Prejudice can be presumed because these policies implicate Mr. Molina's fundamental liberty interests and due process rights. *See Delgado-Corea v. INS*, 804 F.2d 261, 263 (4th Cir. 1986) (holding that "violation of a regulation can serve to invalidate a deportation order when the regulation serves a purpose to benefit the [noncitizen]" and the violation affected "interests of the [noncitizen] which were protected by the regulation" (internal quotations and citation omitted)). These policies provide Mr. Molina with a discrete opportunity to obtain freedom from unduly harmful conditions of release/supervision and that opportunity has thus far been withheld from him. *See Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

70.     If ICE were to review Mr. Molina's ATD conditions under these policies, it would likely decide—and indeed, would be directed under the policies—to either discontinue Mr. Molina from the ATD program altogether now that his removal is not reasonably foreseeable, or at least remove the harmful ankle monitor that has negatively affected his serious mental health and medical conditions.

71.     Therefore, Mr. Molina has been prejudiced by ICE's failure to review his ATD conditions under the aforementioned policies. According to the *Accardi* doctrine, ICE's departure from its own policy is arbitrary, capricious, and contrary to law under the APA.

72.     As a remedy, this Court should review Mr. Molina's ATD conditions under these policies and either order Mr. Molina's disenrollment from the ATD program altogether, or else order less restrictive ATD conditions, to include the removal of the ankle monitor. *See Jimenez*, 317 F. Supp. at 657 ("In these circumstances, it is most appropriate that the court exercise its equitable authority to remedy the violations of petitioners' constitutional rights to due process by promptly deciding itself whether each should be released."). At the very least, this Court should order that ICE immediately review Mr. Molina's ATD conditions under the aforementioned policies and provide a written decision detailing which ATD conditions ICE deems necessary to continue. *See Damus*, 313 F. Supp. 3d at 343.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF THE DUE PROCESS CLAUSE OF
### THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

73.     Mr. Molina realleges and incorporates by reference the paragraphs above.

74.     ICE has violated Mr. Molina's due process rights by denying him any meaningful opportunity to be heard on the reconsideration of his ATD conditions and by failing to provide any substantive explanation as to why the ATD conditions continue to be reasonably necessary.

75.     As a remedy, this Court should review Mr. Molina's ATD conditions and either order Mr. Molina's disenrollment from the ATD program altogether, or else order less restrictive ATD conditions, to include the removal of his ankle monitor. Alternatively, this Court should order the Attorney General to provide a review/due process hearing before an Immigration Judge where ICE would bear the burden of proving that the current ATD conditions are necessary and narrowly tailored to serve an important government interest. At the very least, this Court should order that

ICE immediately review Mr. Molina's ATD conditions and provide a written decision detailing which ATD conditions ICE deems necessary to continue.

## COUNT II

### ARBITRARY AND CAPRICIOUS AGENCY ACTION UNDER THE APA, 5 U.S.C. § 706(2)(A) —VIOLATION OF THE 2009 VENTURELLA MEMO

76.    Mr. Molina realleges and incorporates by reference the paragraphs above.

77.    Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the *Accardi* doctrine, agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" when it violates the agency's own policies.

78.    ICE has deviated from the 2009 Venturella Memo by imposing and continuing to impose ankle monitoring as an ATD condition on Mr. Molina despite his serious medical and mental health conditions. This is arbitrary, capricious, and contrary to law in violation of the APA.

79.     As a remedy, this Court should apply the 2009 Venturella Memo to Mr. Molina's case and order ICE to remove Mr. Molina's ankle monitor and impose less restrictive monitoring methods for Mr. Molina that do not include GPS monitoring. Alternatively, this Court should order that ICE immediately review Mr. Molina's case under the 2009 Venturella Memo and provide a written decision detailing which ATD conditions, if any, ICE deems necessary to continue and the reasons therefore.

## COUNT III

### ARBITRARY AND CAPRICIOUS AGENCY ACTION UNDER THE APA, 5 U.S.C. § 706(2)(A) —VIOLATION OF THE 2011 MEAD MEMO

80.    Mr. Molina realleges and incorporates by reference the paragraphs above.

81.     Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the *Accardi* doctrine, agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" when it violates the agency's own policies.

82.     ICE has violated the 2011 Mead Memo by continuing to impose ATD conditions on Mr. Molina after his grant of final immigration relief, which has rendered his removal in the reasonably foreseeable future highly unlikely. This is arbitrary, capricious, and contrary to law in violation of the APA.

83.     As a remedy, this Court should apply the 2011 Mead Memo to Mr. Molina's case and order Mr. Molina's disenrollment from the ATD program altogether, or order ICE to impose alternative monitoring methods for Mr. Molina that do not include GPS monitoring. Alternatively, this Court should order that ICE immediately review Mr. Molina's case under the 2011 Mead Memo and provide a written decision detailing which ATD conditions, if any, ICE deems necessary to continue and the reasons therefore.

## COUNT IV

### ARBITRARY AND CAPRICIOUS AGENCY ACTION UNDER THE APA, 5 U.S.C. § 706(2)(A) —VIOLATION OF THE 2022 DIRECTIVE

84.     Mr. Molina realleges and incorporates by reference the paragraphs above.

85.     Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the *Accardi* doctrine, agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" when it violates the agency's own policies.

86.     ICE has violated its 2022 Directive by disregarding its obligation to work collaboratively with Mr. Molina's attorneys of record to ensure that Mr. Molina's ongoing

reporting conditions or obligations are appropriate and that his continued participation in the ATD program is tailored to his special needs as a person with serious mental health and medical conditions who was also determined to be incompetent by an IJ. This is arbitrary, capricious, and contrary to law in violation of the APA.

87.    As a remedy, this Court should apply ICE's 2022 Directive to Mr. Molina's case and order ICE to remove Mr. Molina's ankle monitor and impose alternative, less restrictive monitoring conditions on Mr. Molina that do not include GPS monitoring. Alternatively, this Court should order that ICE immediately review Mr. Molina's case under the 2022 Directive and work collaboratively with Mr. Molina's attorneys of record to ensure that Mr. Molina's ongoing reporting conditions or obligations are appropriate and that his continued participation in the ATD program is tailored to his special needs as a person with serious mental health conditions who was also determined to be incompetent by an IJ. "Working collaboratively" should include, at the very least, ICE providing a written decision detailing which ATD conditions, if any, ICE deems necessary to continue and the reasons therefore.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Mr. Molina respectfully requests that this Court:

a.    Assume jurisdiction over this matter;

b.    Declare that ICE's continued imposition of ATD conditions including ankle monitoring on Mr. Molina without any review or reconsideration violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and/or the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

c.    Order Mr. Molina's disenrollment from the ATD program altogether or order less restrictive ATD conditions that do not include GPS monitoring;

d.  Alternatively, order the Attorney General to provide a review/due process hearing before an Immigration Judge where ICE would bear the burden of proving that the current ATD conditions are necessary and narrowly tailored to serve an important government interest;

e.  As a further alternative, order that ICE immediately review Mr. Molina's ATD conditions and provide a written decision detailing which ATD conditions, if any, ICE deems necessary to continue and the reasons therefore;

f.  Grant all such other or further relief this Court deems just and proper.

Dated:  November 13, 2023                              Respectfully submitted,


                                                      */s/ P. Nicholas Peterson*
                                                      P. Nicholas Peterson
                                                      VSB No. 75303
                                                      WILEY REIN LLP
                                                      2050 M Street, NW
                                                      Washington, DC 20036
                                                      (202) 719-7000
                                                      (202) 719-7049
                                                      npeterson@wiley.law

OF COUNSEL:

Theodore A. Howard (*Pro hac vice* motion to be filed)
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
(202) 719-7049
thoward@wiley.law

Evan Benz (*Pro hac vice* motion to be filed)
CAPITAL AREA IMMIGRANTS' RIGHTS COALITION
1025 Connecticut Ave., NW
Suite 701
Washington, DC 20036

(202) 331-3320
evan@caircoalition.org

Amber Qureshi (*Pro hac vice* motion to be filed)
Matthew Vogel (*Pro hac vice* motion to be filed)
NATIONAL IMMIGRATION PROJECT
2201 Wisconsin Ave NW
Suite 200
Washington, DC 20007
(617) 227- 9727
amber@nipnlg.org
matt@nipnlg.org

Attorneys for Petitioner Gregorio (Marcos) Molina Santana